Good morning. May it please the Court, Counsel, I'm Paul Pashy. I represent the Defendant, Precision Cabinets, Inc. A famous author once wrote that logical consequences are the scarecrows of fools and the beacons of wise men. And the reason I'm bringing that up is because in this case we're dealing with a concept that applies in Illinois workers' compensation law. And that is if an insurer writes a policy in this state for workers' compensation coverage, then that insurer is going to be subject to some statutory consequences, including the fact that there are statutory coverage obligations that may or may not appear in the actual policies that they write. In this case, the Commission found that such a statutory coverage obligation existed between travelers' insurance and Isaac Klein's injury. And the circuit court reversed that in a decision that was not only erroneous from a legal standpoint, but it applied standards that have nothing to do with the question that was actually pending before that court. I mean, this has come down to the travelers' position, as I understand it. They're arguing that Precision, because they were not named as an insurer in 2003, without that endorsement, therefore, it didn't cover them. Is that in essence what they're saying? There should have been some endorsement specifically naming them. I agree that that's what they're saying. I disagree that that has any relevance on the analysis that needs to be undertaken to answer the question of whether there should be coverage. And we might agree with you on that. Is that because of the other section of the Act, 4A.3? It's, yes. My main argument is that 4A.3 answers the question very simply and succinctly. 4A.3 says that any time there's a policy, it must cover the entire liability of the named insured. In this case, the named insured is ECI. Mr. Klein is undisputably an employee of ECI. And he was still an employee at the period that this policy covered, in a time when he was injured. So simply applying Was he loaned an employee out, right, to Precision? Yes. He was lent out to Precision. Is it possible for ECI to have an agreement with Precision that they are to cover him? Yes. In fact, it's not only possible, that is the facts of this case. For reasons that I'm not clear on, the actual written agreement was not put into the record, but there was testimony by at least three witnesses that are cited in the arbitration and commission decision that support the existence of that agreement. Travelers implicitly agrees or concedes the existence of such an agreement in its brief. I don't really think that that's at issue here, that there was an agreement that ECI was going to provide workers' comp coverage for anything that happened to its employees while working for Precision. And that implicates another section of the Act, which is Section 1A.4. But to get back to my 4A.3 discussion for one more moment, Travelers concedes that Klein was its employee, or was an employee of ECI. And it also concedes that it had this policy in effect. 4A.3 could not be more clear. There's no ambiguity in the statute. If we go on to what Justice Holdridge was referring to as far as the lending agreement between ECI and Precision, again, there's no dispute that ECI was the loaning employer, Precision was the borrowing employer, and that there was this agreement that ECI would provide coverage. Once that is established, Section 1A.4 states that ECI as the loaning employer becomes primarily liable for the injury. The corrugated metals case also supports that consequence. And then under Section 4G of the Act, if ECI is primarily liable, then its insurer, Travelers, becomes primarily liable if ECI doesn't pay. I think there's ample evidence that ECI may have attempted to pay at some point, but that eventually it came down to Travelers. The other concept that is raised under Section 1A.4 is that when you have a lending and borrowing situation, the liability is joint and several. The joint liability of ECI was never abrogated by any circumstances of this case. Klein was already their primary employee. They had this joint liability under Section 1A.4 of the Act, so there was no point in time when Klein wasn't directly covered by this policy, whether or not he worked for Precision. So whether you use the clearly erroneous standard of review or the de novo standard of review, I think that both of these sections of the Act compel the finding that the commission came to, which is that Travelers' policy was the primary coverage for this injury. The rest of the issues that are raised in the briefs, in my opinion, are red herrings. The application of the ELCA, the But more importantly, the ELCA does not have any provisions in it that negate coverage of a policy. They only apply to disclosures and premiums. It has nothing to do with whether a policy affords coverage or doesn't afford coverage in a certain situation. More importantly, the perceived nonpayment of premiums, which was I believe the linchpin of the circuit court's decision to reverse the case, is entirely irrelevant to the inquiry, too. First of all, there's no evidence that there was nonpayment of premiums. Secondly, if there was some kind of dispute about what the appropriate premium was, the duty was on Travelers to investigate. When they write a policy of insurance, they're required by the Illinois Insurance Code to find out what the assets and liabilities are of the insured and to set their premium accordingly. In fact, Travelers came to be involved in this case out of the assigned risk pool. That's true. So would you argue that that would put a greater burden on them once they're assigned to ECI to determine who ECI is employed? I would argue that that's exactly the case, because the risk pool by definition involves high-risk insurers. And if a company like Travelers is compelled to cover them by that statute, then it would seem to me there would be an even more, a greater sense of urgency to investigate the insured and find out what they have and what they're required to cover. They didn't have any choice about insuring ECI. They had to. That's my understanding. But at the same time, they had full capability to investigate and inquire into ECI's records, at which point they would have seen Klein's name on the payroll, because he was on the ECI payroll. They would have also found that Precision had been a borrowing employer since 2000. So that was already ongoing for two years before this policy at issue went into effect. The third point is that the insurance code allows Travelers to retroactively recover premiums if they find out later that they undercharged. And the interesting thing was there's a case where Travelers itself was the plaintiff where they were found to be entitled to just that kind of recovery against a loaning employer who had gone bankrupt after a case had been filed by an employee of a borrowing employer. It's almost on all fours with this case as far as at least establishing Travelers' ability to recover. Recover premiums? Pardon me? Recover only premiums? Correct. But recovering premiums is what they would have gotten if there was no dispute at all about coverage. That's how the insurance business works. They have to calculate the premium, and then they have to insure the risk. And it's their business to figure out the mathematics of how those things relate. Yeah, but there's such a thing as buying coverage and indemnifying through the premium. And I mean, this is after the horses left the barn. So you get your premium back, but you never went and bought that reinsurance to cover that potential indemnity. Again, it goes back to their original duty to investigate then before something happened, which they failed to do. That's a better argument. I mean, the other thing. Isn't it common in workers' compensation for insurers to go back and collect additional premiums based upon what the risk has been? That's my understanding. Because they do an audit. Right. And there's a modification factor that's done to balance out. And sometimes it goes the opposite way, where they have to refund premiums if the modification factor is low. The last thing I wanted to just... But isn't that based on loss? Yes. Okay. Which, again, is still available to travelers at any time in this case. The last thing I wanted to touch upon was this judicial notice argument. And I would say that the Commission correctly declined to accept the additional evidence that was offered by travelers before the Commission. And the Circuit Court, again, correctly declines to allow that evidence into the record. The Act specifically covers that situation, doesn't it? Absolutely. Especially at the Commission level. But the travelers was urging that the Circuit Court or this Court could independently allow the evidence in, which I would argue is also not proper. For the simple reason that we're after the fact here. But for the more specific reason that these documents that they're trying to offer are neither readily verifiable nor are they relevant to the issue. Nothing in those documents pertains to the question of whether there's statutory coverage under the policy. It has to do with a bunch of ancillary issues that don't impact the outcome of the policy coverage question one way or the other. Lastly, I make a public policy argument based upon the remedial nature of the Workers' Compensation Act. That a policy at issue like the one in this case should be interpreted in favor of coverage to fulfill the remedial purpose of the Workers' Comp system. So the logical consequences here, in my opinion, should be a beacon rather than a scarecrow. The statute, the facts of the case, and the case law all support the Commission's original decision that there should have been primary coverage with travelers. So for these reasons and those discussed in the briefs I filed on behalf of Precision, I respectfully request this Honorable Court to reverse the judgment of the Circuit Court and reinstate the decision of the Commission in its entirety. Thank you. Good morning, and may it please the Court and Council. My name is Mike Reese and I'm here today on behalf of Travelers. We heard very little in Council's argument about what the Employee Leasing Company Act actually provides. The statute is clear and concise. Section 30A1 provides that the lessee shall be identified by endorsement and that coverage, quote, under the endorsement shall be limited to the named insured's employees leased to the lessee, close quote. The statute uses the word shall and is thus mandatory. Coverage shall be limited to employees who are leased to the lessee. Nothing about the mandatory language is ambiguous. Applying that law as written, travelers owed no coverage when Precision Cabinets, as the clients of ECI, was not added to the policy until more than seven months after Klein was injured on January 10, 2003. Counsel, what do you make of the purpose of Section 4A3? I think 4A3 is a provision that allows or provides for one way in which an employer's obligation to insure the liability can be affected. And actually there are a number of ways that that can be done. It can be done through self-insurance. It can be done through a bond. It can be done through a policy issued by an admitted carrier. That's A3. And there's a fourth way. And that way is some other provision that is satisfactory to the commission. That's A4. Well, how do you make of this argument? In purchasing the compensation coverage through travelers, did ECI not purchase it for all of its employees, including the claimant? Didn't they do that one? This policy is rated, I think the classification is it's a employee leasing type policy. That's how it's classified. You can see that in the record. And under that policy, the policy has to be compliant with the statute. And what we're saying is it's not just that statute. It's also the Employee Leasing Company Act, which we believe is the more specific and the more recent enactment. So you're saying, in your opinion, that trumps the overarching language in 4A3. I believe it is consistent with that under A4 because when the policy issues and it is compliant with the statute, it is an arrangement that is deemed to be satisfactory to the commission when it's on file as it was here. So it's not just A3. It's A4. Because the compact has its own carve-out provision. It has its own safe harbor provision that allows for another way to satisfy the statutory obligation. So a company couldn't go to an injury endorsement. How do we know this? In addition to the language of 30A1 that I read to you before, look at subsection D. D talks about proof of coverage having to issue within 30 days of coverage being affected. E-F-F-E-C-T-E-D. Affected. Being brought about. If you look at subsection D, you know that coverage is triggered from the date of the endorsement. The coverage is limited, shall be limited, to employees of ECI who are leased to the client. Precision cabinets. Here they're not endorsed until August 29, 2003. Seven months after the injury took place. I believe that the statutes are consistent. They can be harmonized. I think that the Employee Leasing Company Act falls within the carve-out provision of A4. And that the endorsement that we issued tracks the statute. It's coextensive with what the Act requires. Now, the Commission's decision found that all employees were covered during the coverage period. Their finding directly contravenes section 30A, which states, to the contrary, that coverage shall be limited to employees leased to the lessee. And it further contravenes subsection D of the Act, which ties the issuance of the proof of insurance to 30 days from when the coverage is being affected. Coverage runs from the date of the endorsement, not through the entire policy period. To adopt the Commission's reasoning that employees are covered no matter what would frustrate the declared purpose of section 5 of the Employee Leasing Company Act, which is to ensure that the premium is, quote, commensurate with exposure and anticipated claim experience, close quote. Now, the Commission acknowledged that there was no timely disclosure here. They said that. No timely disclosure. They acknowledged that their conclusion thwarted the purpose of the statute. We submit that it would be futile to impose the record-keeping and the reporting requirements unless or if the legislature intended that the insurer owed coverage for all employees from inception of the policy, regardless of whether and when a client is added to the policy. A court should not assume that the legislature engaged in a useless act, yet that is precisely the interpretation the Precision Cabinet wants you to adopt. They have never explained how that's how the Employee Leasing Company Act can be read to require us to cover a risk before the date that the endorsement issued. We never received a premium for this risk until August 29, 2003. Precision Cabinet simply ignores LeadingEdge's role in this case. ECI never reported this claim to travelers. Instead, LeadingEdge was listed as the insurer. It was non-admitted, and it was part of the fraud. But LeadingEdge was listed on various health claim forms pertaining to services rendered to client in 03, 04, and 05. There is not a shred of evidence to suggest that ECI paid us a premium based on the lease before August 29, 2003, when LeadingEdge was actually paying hundreds of thousands of dollars. We were not notified about this claim until the middle of 06, when LeadingEdge basically defaulted on that obligation. We were put on notice by the petitioner's attorney, not by ECI. They were not looking to us. They knew they had no coverage for this. We submit that public policy does not favor requiring travelers to extend coverage to ECI. The Workers' Comp Act, which we've been talking about, is not the last word on the subject. Yes, statutes express public policy. Section 30 of the Employee Leasing Company Act is the more recent and the more specific expression of that public policy. And we submit it would violate that policy to hold that without remuneration, travelers had to extend coverage to an employee leased many months before the lessee was ever put on the policy. The trial court was correct to hold that this was the joint responsibility of ECI and Precision Cabinet's own carrier, West Bend Mutual Insurance Company. I want to just turn for a moment to the cross appeal, which we have raised with regard to the court taking judicial notice of court records and administrative proceedings. I was surprised to hear today that counsel questioned the reliability and the authenticity of the records that are at issue here. These records are put forth in greater detail in our brief and the consent order and stipulation is included in the appendix to our brief at pages 12 and 17 of the appendix. This court can take judicial notice of any records which will aid in the efficient disposition of the case. It doesn't matter if it was before the arbitrator or if it wasn't before the commission or even if it wasn't before the trial court. You can take judicial notice because you're the appellate court. As far as what these records show, they show first of all that ECI had coverage with a non-admitted carrier leading edge between January 1 of 03 and January 1 of 04. That ECI, this is through the consent order, agreed to compensate all valid claims between January 1 of 03 and September 1 of 03. And that traveler's coverage through the assigned use pool became effective only as of August 29, 2003. Now, why do you care about all that? Okay. If you look at the traveler's policy, what you're going to find is that when the policy incepted in October of 02, they only had four clients listed. Four clients, a premium of, I think it was about $55,000 or $84,000. All of a sudden, August 29, 2003, page after page after page of endorsements naming all of their clients. Well, why was that? That was because they had entered into a, that was because they had to add those clients and their leasing arrangements on the policy. The records explain why ECI never reported this claim to travelers. Leading edges, payments of the claim, the diversion of insurance premiums. The record does show the federal indictment, which is also part of the record, and why ECI had all of these arrangements put on the policy only through or beginning of September of 03. Taking judicial notice will lead to an informed decision and prevent the court from making its decision in a factual vacuum. We ask you to affirm the trial court and reverse the industrial commission and on a cross appeal, we ask that you reverse the trial court and take judicial notice of the records because they will help you decide the case. Thank you very much. Briefly on rebuttal, I mainly want to focus on the language of the ELCA, which I think is, again, unambiguous and does not support the interpretation urged by Mr. Reis. Section 30 does not say anything about coverage lapsing or coverage being denied or coverage even being mandatory. All it talks about is what an endorsement shall state. The endorsement shall state what coverage will be. The endorsement shall state what the experience is. The failure for the endorsement to state those things does not come with any consequence, saying that there is now no coverage under the policy. That section does not negate Section 43 of the Workers' Compensation Act and does not change the fact that Section 4A3 also contains the final statement that any provision in any policy or in any endorsement attached thereto attempting to limit or modify in any way the liability of the insurance carriers issuing the same, except as otherwise provided herein, shall be wholly void. So if there was a problem with the endorsement, the problem is what's void, not the coverage under Section 4A3. Well, that doesn't attempt to limit or modify. He's saying these can be read in harmony, and he was inviting you to answer the public policy question, I suppose. He's saying, why should the Act require them to be obligated to provide coverage before somebody's ever added to the policy? Well, we're talking about, I suppose, another apple and orange situation. The obligation of 4A3 is between the insurer, really, and the injured worker. It's saying that there has to be coverage because the injured worker is entitled to have coverage. That's the remedial purpose of the Act. The intent of the policy of the ELCA is between the loaning employer and the insurer. And in this case, I don't have any dispute with the fact that ECIO is an appropriate policy or premium to travelers for the coverage that's been afforded. But these are two different concepts here and two different groups that are implicated by these different policies. I think that's all I have. Thank you very much. Thank you, Counselor McCorkle. Take the matter under a driver for disposition.